**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2026 IL App (3d) 250509-U

Order filed June 15, 2026

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2026

| | | |
|---|---|---|
| PAL WIN RETAIL INVESTORS, LLC, an Illinois Limited Liability Company, | ) ) ) | Appeal from the Circuit Court of the 18th Judicial Circuit, Du Page County, Illinois. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | |
| KAREN SWINFORD, Individually, and MINDFUL LIFE OF ARLINGTON HEIGHTS, LLC, d/b/a ANYTIME FITNESS, an Illinois Limited Liability Company, | ) ) ) ) ) ) | Appeal No. 3-25-0509 Circuit No. 24-LA-1010 |
| | ) ) | The Honorable David E. Schwartz, |
| Defendants-Appellants. | ) | Judge, Presiding. |

JUSTICE PETERSON delivered the judgment of the court.
Justices Holdridge and Brennan concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The trial court: (1) correctly found that plaintiff had reasonably attempted to mitigate damages; (2) erred in finding that defendant Swinford's guaranty ended in May 2024, rather than May 2023, and granting plaintiff's motion for partial summary judgment on that issue, and denying Swinford's cross-motion; (3) erred in assessing damages and attorney fees against Swinford based upon a May 2024 expiration date of Swinford's guaranty; and (4) was unclear in its damages and attorney fees ruling as to whether it intended for interest and attorney fees that accrued after the end date of Swinford's guaranty to be assessed against Swinford.

The appellate court, therefore: (1) affirmed the trial court's finding that plaintiff had reasonably attempted to mitigate damages; (2) concluded that Swinford's guaranty ended in May 2023; (3) reversed the trial court's grant of plaintiff's motion for partial summary judgment on that issue and granted Swinford's cross-motion; and (4) vacated the trial court's damages and attorney fees awards and remanded for the trial court to recalculate those awards. Affirmed in part, reversed in part, and vacated in part. Cause remanded with directions.

¶ 2        Plaintiff, Pal Win Retail Investors, LLC, filed a civil lawsuit against defendants, Karen Swinford and Mindful Life of Arlington Heights, LLC, for breach of a commercial lease and personal guaranty agreement. During pretrial proceedings, the parties filed cross-motions for partial summary judgment to have the trial court determine whether Swinford's obligations under the guaranty agreement ended in May 2023, as claimed by Swinford, or May 2024, as claimed by plaintiff. The trial court ruled in plaintiff's favor and granted plaintiff's motion for partial summary judgment on that issue. Swinford filed a motion to reconsider, which the trial court denied. The case proceeded to a bench trial with the issue of liability not in dispute. The trial court found in plaintiff's favor on both of plaintiff's claims, determined that plaintiff had reasonably attempted to mitigate damages, and awarded damages, attorney fees, and costs to plaintiff. Defendants appeal. We affirm the trial court's judgment in part, reverse the trial court's judgment in part, vacate the trial court's judgment in part, and remand this case with directions for further proceedings.

¶ 3                                    I. BACKGROUND

¶ 4        In May 2016, defendant, Mindful Life of Arlington Heights, LLC (Mindful Life), entered into a written commercial lease to rent certain retail space in a shopping center in Arlington Heights, Illinois, from plaintiff to be used for the operation of an Anytime Fitness franchise. The lease was signed on May 26, 2016, by defendant Swinford as president of Mindful Life and on June 20, 2016, by a representative or member of plaintiff. The lease was 26 pages long, not

counting the exhibits that were attached to and made part of the lease, and contained several provisions. The term of the lease was for approximately 10 years with several options to renew and was supposed to start running on the "Commencement Date" of the lease. The minimum rent or base rent of the lease was $7,000 per month during the first five years of the lease and approximately $7,600 per month during the second five years. In addition to the base rent, Mindful Life was required to pay a portion of the common area maintenance (CAM), property taxes, and insurance for the property and a $7,000 security deposit. The lease also contained a provision that stated that plaintiff's failure to relet the premises in the event of a default did not release Mindful Life's liability for damages and a provision that allowed either party to recover reasonable costs and attorney fees that were incurred in enforcing the lease.

¶ 5        Because plaintiff was going to have to complete a substantial buildout of the property to make it suitable for Mindful Life's contemplated business, Mindful Life was not going to be able to take possession of the property right away. For that reason, some of the important dates listed in the lease were not specifically stated and were described in more general terms. The "Possession Date" in the lease was listed as "[u]pon completion of [l]andlord's [w]ork and issuance of the certificate of occupancy for the Premises"; the "Commencement Date" was listed as being the "[s]ame as [the] Possession Date"; the "Rent Commencement Date" was listed as "commenc[ing] the 1st day of the fifth (5th) month following the Commencement Date"; and the "[Lease] Expiration Date" was listed as being "[o]ne hundred twenty (120) months and any partial month from the Rent Commencement Date."

¶ 6        Several exhibits were attached to the lease and were specifically incorporated into and made part of the lease. One such exhibit was a personal guaranty agreement that was signed by Swinford in her individual capacity as guarantor the day after she had signed the lease on behalf

3

of Mindful Life. Among other things, the guaranty agreement provided that: (1) it related to "that certain [l]ease *** with an Effective Date of 26 May, 2016," made by and between Mindful Life and plaintiff; (2) plaintiff was unwilling to enter into the lease without the guaranty; (3) the guaranty was for "the first seven (7) years of the [l]ease"; (4) in addition to absolutely and unconditionally guaranteeing the payment of rent and other sums under the lease, Swinford also guarantied "the punctual and full performance and observance of all other terms, covenants, conditions, and agreements of the [l]ease"; (5) Swinford's obligations under the guaranty agreement could not be terminated, affected, or impaired by any changes, modifications, or amendments to the lease or by any extension or renewal of the lease term; (6) in the event of a default, plaintiff was not required to proceed first against Mindful Life before it proceeded against Swinford as the guarantor; and (7) plaintiff could recover its reasonable costs and attorney fees if it had to take action to enforce the guaranty agreement or to protect its rights.

¶ 7    In July 2017, plaintiff and Mindful Life executed a commencement date agreement that set May 20, 2017, as the "Possession Date" and "Commencement Date" referred to in the lease; May 27, 2018, as the "Rent Commencement Date"; and May 31, 2028, as the "Lease Expiration Date."

¶ 8    In August 2020, due to the negative financial impact of the COVID-19 pandemic, plaintiff and Mindful Life executed an amendment to the lease that permitted Mindful Life to defer payment of over $70,000 in rent, CAM, real estate taxes, and insurance that had accrued or would accrue. Pursuant to the amendment, Mindful Life was required to pay the deferred amount in monthly installments over the term of the lease. The amendment allowed plaintiff to accelerate the entire unpaid balance of the deferred amount if Mindful Life failed to pay any of the deferred-amount installments. Swinford, as guarantor, consented to the amendment, reaffirmed

4

her obligations under the guaranty agreement "notwithstanding that the terms of [the] Amendment may materially increase such obligations," and also reaffirmed that her obligations under the guaranty agreement remained unmodified and in full force and effect.

¶ 9 In April 2023, Swinford contacted plaintiff to inform plaintiff that Mindful Life's business was losing money and that Swinford planned to close the facility at the end of the following month. Mindful Life ultimately vacated the premises in May or June 2023 and made its last rent payment to plaintiff in June 2023. The total deferred amount remaining at that time was over $40,000. Mindful Life had also failed to pay certain other amounts that were arguably due and owing.

¶ 10 In November 2023, plaintiff filed a two-count complaint against defendants in the Cook County trial court. Count I alleged a breach of the lease by Mindful Life, and count II alleged a breach of the guaranty agreement by Swinford. Plaintiff attached several supporting exhibits to the complaint, including the lease, the guaranty agreement, the commencement date agreement, the COVID-19 amendment, and a statement of damages (also referred to at times as the ledger). The case was later transferred to Du Page County.

¶ 11 In December 2024, plaintiff and Swinford filed cross-motions for partial summary judgment to have the trial court determine whether Swinford's obligations under the guaranty agreement had ended in May 2023, as claimed by Swinford, or in May 2024, as claimed by plaintiff. The parties asked the trial court to make that determination based solely upon the written lease documents, to the extent that the trial court determined that those documents applied, and did not ask to submit parol evidence if the trial court found that the applicable language was ambiguous.

5

¶ 12    Both sides filed written briefs in support of their respective positions on the cross-motions for partial summary judgment. Swinford argued in her written brief that the guaranty agreement ran from May 26, 2016, the date referred to in the guaranty agreement as the effective date of the lease, to May 26, 2023, seven years after the date that the guaranty agreement had started to run. Plaintiff, on the other hand, argued that the guaranty agreement ran from May 20, 2017, the commencement date of the lease as specified in the commencement date agreement, to May 20, 2024.

¶ 13    In January 2025, the trial court held a hearing on the cross-motions for partial summary judgment. After listening to the oral arguments of the attorneys, the trial court ruled in plaintiff's favor and found that the guaranty agreement started to run on May 20, 2017, the commencement date of the lease, and ended seven years from that date on May 20, 2024. In reaching that conclusion, the trial court reasoned that it would be "illogical to have a personal guarantee for rent start a year before any rent [was] due." Based upon its determination in that regard, the trial court granted plaintiff's motion for partial summary judgment and denied Swinford's cross-motion.

¶ 14    Swinford filed a motion to reconsider and argued that the trial court had misapplied the law and the facts of the case in making its ruling. A hearing was later held on the motion. During the oral arguments at the hearing, plaintiff's attorney admitted in responding to a question from the trial court that plaintiff would have looked to recover from Swinford under the guaranty agreement any financial loss that plaintiff would have suffered if Mindful Life had walked away from the deal prior to the commencement date of the lease. The trial court stated that the matter was "close" but ultimately upheld its prior ruling in favor of plaintiff and denied Swinford's motion to reconsider.

¶ 15    In August 2025, a bench trial was held in the trial court on the two claims alleged in plaintiff's complaint. As the underlying factual circumstances dictated, defendants did not dispute that Mindful Life had breached the lease. The only issues for the trial court to decide were whether plaintiff had reasonably attempted to mitigate damages (raised as an affirmative defense by defendants) and the amount of damages, attorney fees, and costs to be assessed against each defendant.

¶ 16    At the outset of the trial, the parties stipulated to the admission of the main written documents—the lease, the guaranty agreement, the commencement date agreement, and the COVID-19 amendment. The parties also stipulated to the admission of plaintiff's statement of damages and that the mathematical calculations in that statement were correct, but defendants reserved the right to raise defenses to certain aspects of the statement and to challenge whether certain amounts were appropriately included in the statement. Additional documentary exhibits were admitted into evidence as the trial proceeded.

¶ 17    During the course of the trial, the parties presented the testimony of only two witnesses— one for each side. Plaintiff called Michael Kolodny, one of its members, to testify as its only witness. Kolodny had over 40 years of experience as a commercial property owner and manager, including experience marketing commercial properties for lease. Kolodny had worked with numerous leasing brokers over the course of his career. He was actively involved in the management and operation of the shopping center where the leased premises were located, and his primary role was to lease the vacant spaces at that center.

¶ 18    With regard to plaintiff's efforts to mitigate damages, Kolodny testified that in April 2023, plaintiff was notified by Swinford that she was having financial issues and was planning on closing the Anytime Fitness franchise at the shopping center. After Swinford/Mindful Life

7

vacated the premises, plaintiff tried to find someone to rent the property but was unable to do so. Plaintiff initially focused on trying to get another gym franchise to rent the property. Plaintiff (or Kolodny) contacted other Anytime Fitness franchisees in the area, the franchisor, and the operators of other fitness, recreation, and physical therapy businesses but was ultimately unsuccessful.

¶ 19    Plaintiff had a listing agreement with Frontline Real Estate Partners, a leasing broker, to help rent space in the shopping center. Frontline placed a large for-lease sign in front of the shopping center and smaller signs in windows of the vacant stores at the center. Frontline also listed the property on one or more multiple listing services, including LoopNet.

¶ 20    In addition to its efforts through Frontline, plaintiff also hired Carlson Integrated, a marketing and public relations firm that specialized in shopping centers, to help plaintiff find a replacement tenant for the Mindful Life property. Using an email-blast platform called Resquared, Carlson sent monthly or quarterly targeted emails and brochures of the property to 250-300 real estate brokers from a list that Kolodny had provided and also to prospective tenants. The email efforts produced several potential tenants, each of whom Kolodny contacted directly when he received a response from the email blasts. In addition to the emails, Carlson or Kolodny also sent brochures by regular mail to various Anytime Fitness locations from a list that Kolodny had put together after researching online.

¶ 21    During the bench trial, defendants objected to the admission of the Resquared documents into evidence based upon hearsay and lack of foundation. The trial court overruled those objections and admitted the documents into evidence but indicated that it was only considering the documents for the effect on the listener and not for the truth of the matters asserted. Some of

the Resquared documents showed that a portion of the emails that were sent out were never opened.

¶ 22    In addition to the for-lease signs that had been placed by Frontline, plaintiff had placed its own signs at the shopping center. Plaintiff also had a Facebook page and a webpage that Carlson maintained advertising the property for lease. Of all of the efforts that were used to relet the property, the email blasts were by far the most effective at generating any prospects. Listing services such as LoopNet were costly, according to Kolodny, and did not produce a single prospect.

¶ 23    Kolodny testified further that plaintiff had used diligent efforts to find a replacement tenant for the leased premises because plaintiff wanted to sell the shopping center and needed an anchor tenant (Mindful Life/Anytime Fitness was the anchor tenant prior to that time) for that purpose and because the shopping center was not generating any positive cash flow and was being supported by contributions from the owners to cover the operating costs. In addition, plaintiff did not know if it would be able to collect any money from defendants in a later lawsuit because Mindful Life would likely declare bankruptcy and Swinford's guaranty was limited.

¶ 24    According to Kolodny, plaintiff had used all commercially reasonable means available to seek a replacement tenant for the leased premises and had not eased up at any time in its efforts to lease the space. Kolodny acknowledged, however, that plaintiff never offered to subdivide the property for potential tenants; never accepted any offer for lower rent from any potential tenants; and never produced anything in discovery that showed that the property was listed on LoopNet, social media, or otherwise listed online so that the general public would be aware that the property was available.

¶ 25 As of the date of bench trial in this case, the space that Mindful Life had leased was still vacant. Kolodny noted during his testimony the difficulty of leasing a space the size of the Mindful Life space in the vicinity of the shopping center and pointed out that a similar-sized space in a nearby shopping center had been vacant for 5 to 10 years. Kolodny also noted that the Mindful Life space was not well suited to a national tenant because of the relatively small size of the shopping center.

¶ 26 With regard to the amount of damages to be assessed against each defendant, Kolodny testified that due to the COVID-19 pandemic, plaintiff and Mindful Life had entered into a lease amendment that deferred some of the rent payments for a period of time, after which, Mindful Life was required to pay an additional amount to plaintiff each month until the deferred amount was paid off. The amendment allowed plaintiff to accelerate the debt and to declare the entire remaining deferred balance due and payable if Mindful Life failed to pay any of the monthly installments of the deferred amount. Kolodny acknowledged during his testimony, however, that he did not notify defendants in this case that plaintiff was accelerating the debt and declaring the entire remaining deferred balance immediately due and payable and that he did not know if anyone else from plaintiff had done so.

¶ 27 Kolodny also acknowledged during his testimony that Swinford had paid plaintiff a $7,000 security deposit in connection with the lease, that plaintiff was still holding that amount, and that plaintiff had not applied the security deposit to the back-due amounts reflected in plaintiff's ledger. Kolodny admitted that pursuant to the provisions of the lease, the security deposit should have been refunded to defendants shortly after the end of the initial five years of the lease term because defendants had not been in default prior to that time.

¶ 28     The only witness that defendants called to testify on their behalf was Swinford. Swinford testified that in April 2023, plaintiff reconciled Mindful Life's CAM, property tax, and insurance payments for 2022 and informed Mindful Life that it owed approximately an additional $22,000. Starting that same month (April 2023), plaintiff also increased Mindful Life's rent by approximately $2,000 per month. Due to the increased CAM and rent payments, Mindful Life was no longer able to operate its fitness business.

¶ 29     On the witness stand, Swinford was shown the statement/ledger that plaintiff had submitted and noted that the ledger indicated that the monthly rental amount had been increased by over $500 per month from June through November 2023 without any justification for the increase. In addition, according to Swinford, plaintiff was seeking to collect the entire remaining deferred balance (over $40,000) from the COVID-19 amendment, even though plaintiff had never notified defendants that it was accelerating the debt and declaring the entire remaining deferred balance due. Swinford also confirmed that Mindful Life had paid a $7,000 security deposit to plaintiff in connection with the lease that was never returned.

¶ 30     After all of the evidence had been presented, the trial court took the matter under advisement to give the parties time to submit their written closing arguments. In September 2025, after the arguments had been submitted, the trial court issued a written ruling finding in plaintiff's favor on both claims and also finding that plaintiff had reasonably attempted to mitigate damages. The trial court entered judgment against Mindful Life for approximately $462,000 plus costs and against Swinford for approximately $329,000 plus costs. Defendants appealed.

11

¶ 31                    II. ANALYSIS

¶ 32            A. The Trial Court's Ruling on the Parties'
                Cross-Motions for Partial Summary Judgment

¶ 33        As the first issue on appeal, defendant Swinford argues that the trial court erred in finding

that Swinford's obligations under the guaranty agreement ended in May 2024, rather than in May

2023; in granting plaintiff's motion for partial summary judgment on that basis; and in denying

Swinford's cross-motion for the same relief. Swinford asserts that the trial court's finding

violated the rules of contract interpretation and was contrary to the clear and express language of

the guaranty agreement, which stated that the term of the guaranty was for seven years, without

exception, and that it started to run on the May 26, 2016, effective date of the lease (the date the

lease was executed). In support of that assertion, Swinford contends or points out that: (1) the

guaranty agreement should have been viewed as a separate and independent contract from the

lease because the contracting parties, purpose, and obligations of the guaranty agreement were

different from those of the lease; (2) the guaranty agreement did not mention a "Possession

Date," a "Commencement Date," or a "Rent Commencement Date," and did not state that it ran

for seven years from the "Commencement Date" of the lease; (3) the commencement date

agreement, which was an amendment to the lease, had no effect on the guaranty agreement

because the guaranty agreement stated that Swinford's obligations as guarantor could not be

affected or impaired in any manner by any changes, modifications, or amendments to the lease;

(4) the trial court's reasoning was incorrect because it was founded upon the premise that the

entire purpose of the guaranty agreement was to guaranty the payment of rent, but the guaranty

agreement also guarantied the punctual and full performance and observance of all other terms,

covenants, conditions, and agreements of the lease, in addition to the payment of rent and

contrary to the trial court's reasoning; (5) under the rules of contract interpretation, any doubt or

12

ambiguity in the guaranty agreement must be construed in Swinford's favor because Swinford was the guarantor and also because plaintiff was the drafter of the guaranty agreement; (6) plaintiff's attorney essentially admitted at the hearing on the motion to reconsider that the guaranty agreement started to run on the date that the lease was executed (May 2016) when plaintiff's attorney acknowledged that if there had been a breach in the first year after the lease was signed, plaintiff could have sought to enforce the guaranty to recover any financial losses that it had suffered, even if the commencement date or the rent commencement date had not yet occurred; and (7) the trial court's ruling in this case essentially turned Swinford's seven-year guaranty into an eight- or nine-year guaranty. For all of the reasons stated, Swinford asks that we reverse the trial court's grant of plaintiff's motion for partial summary judgment, that we grant Swinford's cross-motion for the same relief, and that we remand this case for further proceedings.

¶ 34       Plaintiff argues that the trial court's summary judgment ruling was proper and should be upheld. Plaintiff asserts that when all of the lease documents (the lease, the guaranty, the commencement date agreement, and the other documents) are read together as a whole and as one contract, as they must be in the present case, the terms of those documents demonstrate that the parties intended, at the very least, that Swinford's guaranty would start running on the commencement date of the lease, if not on the rent commencement date. According to plaintiff, Swinford's interpretation of the lease/guaranty agreement to the contrary is unreasonable because it would have the guaranty start running before the lease commenced, would shorten the period of time that the guaranty agreement was active during the actual 10-year period of the lease, and would render some of the terms of the lease completely superfluous and meaningless. As to Swinford's remaining contentions on this issue, plaintiff asserts further that: (1) although

13

Swinford focuses on the "effective date" of the lease referred to in the guaranty agreement, that term is not defined anywhere in the lease, appears only once in the guaranty agreement, and was used solely as a means of describing and identifying the lease to which the guaranty agreement referred; (2) if the parties had intended for the guaranty agreement to expire in May 2023 (seven years after the execution date of the lease), as Swinford suggests, they would have said so, rather than choosing language that left the starting and expiration date of the guaranty agreement indefinite; (3) contrary to Swinford's assertion, the commencement date agreement was not an amendment to the lease and merely established specific dates for those dates in the lease that had been described only generally and that were tied to the completion of the buildout and the issuance of a certificate of occupancy; (4) although Swinford asserts that any ambiguity should be construed against plaintiff as the drafter of the guaranty agreement and the lease, there are no facts of record that show that plaintiff was the sole drafter (without revisions from defendants), and the terms of the contract can be easily construed by looking at the contract as a whole such that the drafter rule does not apply; and (5) the trial court's hypothetical about whether plaintiff could seek to enforce the guaranty agreement if a breach occurred prior to the commencement date of the lease was moot, incomplete, and required considerable speculation because any action that arose prior to that time would have been premature until after the lease commenced. For all of those reasons, plaintiff asks that we affirm the trial court's grant of plaintiff's motion for partial summary judgment and its denial of Swinford's cross-motion for the same relief (and also the trial court's later denial of Swinford's motion to reconsider).

¶ 35     The purpose of summary judgment is not to try a question of fact, but to determine if one exists. *Adams v. Northern Illinois Gas Co.*, 211 Ill. 2d 32, 42-43 (2004). Summary judgment should be granted only where the pleadings, depositions, admissions on file, and affidavits, when

14

viewed in the light most favorable to the nonmoving party, show that there is no genuine issue as to any material fact and that the moving party is clearly entitled to a judgment as a matter of law. See 735 ILCS 5/2-1005(c) (West 2024); *Adams*, 211 Ill. 2d at 43. Summary judgment should not be granted if the material facts are in dispute or if the material facts are not in dispute but reasonable persons might draw different inferences from the undisputed facts. *Adams*, 211 Ill. 2d at 43. Although summary judgment is to be encouraged as an expeditious manner of disposing of a lawsuit, it is a drastic measure and should be allowed only where the right of the moving party is clear and free from doubt. *Id.* A trial court's grant of summary judgment is subject to a *de novo* standard of review on appeal. *Id.* When *de novo* review applies, the appellate court performs the same analysis that the trial court would perform. *Direct Auto Insurance Co. v. Beltran*, 2013 IL App (1st) 121128, ¶ 43. A trial court's grant of summary judgment may be affirmed on any basis supported by the record. *Home Insurance Co. v. Cincinnati Insurance Co.*, 213 Ill. 2d 307, 315 (2004).

¶ 36 The trial court in the instant case granted the motion for partial summary judgment based upon its interpretation of the guaranty agreement. A guaranty agreement is an agreement between a guarantor and a creditor wherein the guarantor agrees to be secondarily liable to the creditor for a debt or obligation owed to the creditor by a third party (the debtor). See *Fuller Family Holdings, LLC v. Northern Trust Co.*, 371 Ill. App. 3d 605, 620 (2007); *JP Morgan Chase Bank, N.A. v. Earth Foods, Inc.*, 386 Ill. App. 3d 316, 321 (2008), *rev'd in part on other grounds*, 238 Ill. 2d 455, 474 (2010); *Town & Country Bank of Quincy v. E. & D. Bancshares, Inc.*, 172 Ill. App. 3d 1066, 1073 (1988). A guarantor's secondary liability is triggered by a default of the debtor on the obligation that the debtor owes to the creditor. *JP Morgan Chase Bank, N.A.*, 386 Ill. App. 3d at 321. The extent and other terms of a guarantor's liability are

15

determined from the guaranty agreement, which, like a lease, is interpreted using the general rules of contract interpretation. See *Bank of America National Trust & Savings Ass'n v. Schulson*, 305 Ill. App. 3d 941, 945 (1999).

¶ 37 The primary goal of contract interpretation is to give effect to the intent of the parties. *Virginia Surety Co. v. Northern Insurance Co. of New York*, 224 Ill. 2d 550, 556 (2007). In determining the parties' intent, a court must consider the contract document as a whole and not focus on isolated portions of the document. See *Gallagher v. Lenart*, 226 Ill. 2d 208, 233 (2007); *Premier Title Co. v. Donahue*, 328 Ill. App. 3d 161, 164 (2002). If the language of a contract is clear and unambiguous, the intent of the parties must be determined solely from the language of the contract document itself, which should be given its plain and ordinary meaning, and the contract should be enforced as written. See *Virginia Surety Co.*, 224 Ill. 2d at 556; *J.M. Beals Enterprises, Inc. v. Industrial Hard Chrome, Ltd.*, 194 Ill. App. 3d 744, 748 (1990); *Reaver v. Rubloff-Sterling, L.P.*, 303 Ill. App. 3d 578, 581 (1999). Under those circumstances, the meaning of the contract language is a question of law for the trial court to decide and is an issue that may properly be resolved in a summary judgment proceeding. See *Fuller Family Holdings, LLC*, 371 Ill. App. 3d at 620; *J.M. Beals Enterprises, Inc.*, 194 Ill. App. 3d at 748; *Reaver*, 303 Ill. App. 3d at 581.

¶ 38 On the other hand, if the contract language is ambiguous, in that it is susceptible to more than one reasonable interpretation, the meaning of the contract language may be ascertained through a consideration of extrinsic evidence. *Gallagher*, 226 Ill. 2d at 233. In such circumstances, a question of fact exists for the trier of fact to determine regarding the meaning of the contract language, and summary judgment should not be granted. See *Fuller Family Holdings, LLC*, 371 Ill. App. 3d at 620; *William Blair & Co., LLC v. FI Liquidation Corp.*, 358

16

Ill. App. 3d 324, 334 (2005). An exception to that rule exists, however, if the extrinsic evidence available to construe the ambiguous language is not in dispute. See *William Blair & Co.*, 358 Ill. App. 3d at 342 (stating that summary judgment is generally inappropriate when the contract term in question is ambiguous unless the evidence submitted by the parties leaves no genuine issue of material fact in dispute as to that term). Under those circumstances, the trial court may properly decide the issue as a question of law in a summary judgment proceeding because no question of fact exists as to the matter. See *id.*

¶ 39    In the present case, after reviewing the relevant document or documents, we conclude that Swinford's obligations under the guaranty agreement ended in May 2023 as Swinford asserts. We reach that conclusion regardless of whether we view the guaranty agreement by itself as a separate independent contract or along with the other lease documents as part of a single complete lease agreement. Viewed by itself as a separate contract, the guaranty agreement was clear and unambiguous. It provided that Swinford's guaranty ran for "the first seven (7) years of the [l]ease" and also provided that the effective date of the lease was May 26, 2016. Standing alone, the language of the guaranty agreement can be interpreted only one way—that Swinford's guaranty started to run on May 26, 2016, and that it ended seven years from that date on May 26, 2023.

¶ 40    However, when the guaranty agreement is viewed along with the other lease documents as a single complete lease agreement, an ambiguity arises because none of the documents defined what "the first seven years of the lease" language in the guaranty agreement meant. In addition, the lease contained multiple important date references, such as the "Possession Date," the "Commencement Date," the "Rent Commencement Date," and the "[Lease] Expiration Date," but did not contain a reference for when the guaranty would start to run. Adding to the

17

confusion, the important date references in the lease were described in only general terms and were not consistent with the language or terms used in the guaranty agreement. The fact that the commencement date agreement established the specific dates for each of the important date references in the lease did not in any way resolve the ambiguity because the lease and the guaranty agreement did not use consistent language or terms.

¶ 41    It is well established under the law, however, that a guaranty agreement generally starts to run from the date that the guaranty agreement is executed and delivered (see 20 Ill. L. and Prac. *Guaranty* § 15 (May 2026 Update), and the documents submitted by the parties in the summary judgment proceeding do not dispel the application of that general rule here. In addition, any ambiguity in a guaranty agreement must be construed in favor of the guarantor. See *Schulson*, 305 Ill. App. 3d at 946. Thus, even though the relevant terms of the guaranty agreement arguably become ambiguous when that document is viewed with the lease documents as a single complete agreement, that ambiguity is resolved by the two rules set forth above and only one reasonable conclusion is possible—that the guaranty agreement ran from the date it was executed in May 2016 until the corresponding date, seven years later, in May 2023, as Swinford asserts in this appeal. That conclusion was further confirmed when plaintiff's attorney admitted at the hearing on Swinford's motion to reconsider that plaintiff would have sought to recover on the guaranty if Mindful Life had breached the lease before the commencement date or the rent commencement date in the lease had occurred.

¶ 42    Because under either approach the end result is the same, we need not determine which approach should have been applied in the present case. Under either approach, we must conclude that the trial court erred in granting plaintiff's motion for partial summary judgment on this issue and that the trial court should have granted Swinford's cross-motion for partial summary

18

judgment instead. Accordingly, we reverse the trial court's grant of plaintiff's motion for partial summary judgment, we grant Swinford's cross-motion for the same relief, and we remand this case for the trial court to recalculate its damages awards based upon our ruling on this issue (in line with our ruling on the third issue, as well).

¶ 43                              B. The Trial Court's Finding After
                              Bench Trial Regarding Mitigation of Damages

¶ 44        As the second issue on appeal, both defendants argue that the trial court erred in finding after bench trial that plaintiff had reasonably attempted to mitigate damages. Defendants assert that the trial court's finding was against the manifest weight of the evidence because the evidence presented at the bench trial showed that plaintiff (acting through Kolodny) failed to list the property for lease to the general public, failed to list the property for lease online, failed to subdivide the rental space when requested, refused to reduce the rental rate when requested, and took no corrective actions to lease the space after its initial attempts had failed. Defendants also assert that the trial court's finding that reasonable mitigation efforts had occurred was based upon improperly admitted evidence, the Resquared documents, that were hearsay and lacked foundation. For those reasons, defendants ask that we reverse the trial court's finding that plaintiff made reasonable efforts to mitigate damages and that we remand this case for further proceedings.

¶ 45        Plaintiff argues that the trial court's finding on mitigation of damages was proper and should be upheld. In support of that argument, plaintiff makes three assertions. First, plaintiff asserts that pursuant to the terms of the lease, it had no obligation to mitigate damages. Second, and in the alternative, plaintiff asserts that the trial court's finding—that plaintiff had made reasonable and diligent efforts to relet the space—was well supported by the evidence. Third and finally, plaintiff asserts that the Resquared documents were properly admitted, that defendants

19

waived or forfeited any objections to the admissibility of those documents, and that any error that occurred in the admissibility of those documents did not prejudice defendants. For all of the reasons stated, plaintiff asks that we affirm the trial court's finding that plaintiff reasonably attempted to mitigate damages.

¶ 46        Section 9-213.1 of the Code of Civil Procedure provides that "a landlord or his or her agent shall take reasonable measures to mitigate the damages recoverable against a defaulting lessee." 735 ILCS 5/9-213.1 (West 2022). The purpose of the statute is to require landlords to make reasonable efforts to relet premises that have been vacated by defaulting tenants rather than allowing the premises to stand vacant and then trying to collect the lost rent in the form of damages. *Danada Square, LLC v. KFC National Management Co.*, 392 Ill. App. 3d 598, 609 (2009). Although the statute does not define what constitutes "reasonable measures to mitigate," the case law indicates that the injured party must generally exercise reasonable diligence and ordinary care in trying to minimize its damages. See *Mayster v. Santacruz*, 2020 IL App (2d) 190840, ¶ 34. The burden falls upon the landlord to prove that it complied with the statutory duty to mitigate damages.[1] *Danada Square, LLC*, 392 Ill. App. 3d at 608. If the landlord fails in that burden, the damages that the landlord would otherwise recover are reduced and any losses that the landlord could have reasonably avoided are not recoverable. *Id.*

¶ 47        The question of whether a landlord has satisfied its statutory duty to mitigate its damages is generally a question of fact for the trier of fact to decide. See *MXL Industries, Inc. v. Mulder*,

---

[1]The failure to mitigate damages is generally an affirmative defense that must be pleaded and proved by a defendant. *Rozny v. Marnul*, 43 Ill. 2d 54, 73 (1969). However, in the context of the present case—where a landlord has sued a tenant for lost or unpaid rent that was caused by the tenant abandoning the premises prior to the end of the lease term—courts have held that the burden falls upon the landlord to prove that it complied with the statutory duty to mitigate damages because the landlord is in a much better position to come forward with evidence of its reasonable efforts to mitigate damages. See, *e.g.*, *St. George Chicago, Inc. v. George J. Murges & Associates, Ltd.*, 296 Ill. App. 3d 285, 293 (1998).

20

252 Ill. App. 3d 18, 30 (1993). A trial court's finding on that issue will not be reversed on appeal unless it is against the manifest weight of the evidence. *Id.* A finding is against the manifest weight of the evidence only if it is clearly apparent from the record that the trial court should have reached the opposite conclusion or if the finding itself is unreasonable, arbitrary, or not based upon the evidence presented. See *Best v. Best*, 223 Ill. 2d 342, 350 (2006).

¶ 48 In the present case, after reviewing the lease, the other relevant documents, and the additional evidence presented at the bench trial, we conclude that the trial court did not err in finding that plaintiff had reasonably attempted to mitigate damages. We reach that conclusion for two reasons. First, it appears from the language of the lease that the parties contractually agreed to waive plaintiff's statutory obligation to mitigate damages because the lease specifically provided that the landlord's failure to relet the premises after a default would not release the tenant's liability for damages. See *Takiff Properties Group Ltd. #2 v. GTI Life, Inc.*, 2018 IL App (1st) 171477, ¶ 23 (indicating that the parties to a lease may contractually waive a landlord's obligation to mitigate damages). Thus, as plaintiff contends, plaintiff had no obligation to mitigate damages.

¶ 49 Second, even if the parties had not waived plaintiff's duty to mitigate damages, we would still conclude that the trial court's finding—that plaintiff had reasonably attempted to mitigate damages—was amply supported by the evidence. The evidence presented at the bench trial showed that upon Mindful Life's departure from the premises, plaintiff promptly listed the property for lease with a real estate broker; placed a for-lease sign on the property, in addition to signs that were placed by the broker; retained a marketing and publicity firm to send targeted emails to prospective tenants; advertised the property on its website, social media (Facebook), as well as on one or more of the multiple listing services; and contacted those persons or entities

21

that showed interest in leasing the property to pursue the matter further. In addition, plaintiff's witness, Kolodny, who had managed and rented properties for approximately 40 years, testified that plaintiff's efforts were commercially reasonable and that plaintiff never ceased or eased up on its efforts to rent the premises because plaintiff was initially trying to sell the property and needed an anchor tenant for that purpose. Further, because plaintiff's ability to recover any damages from defendants was uncertain. Therefore, under the circumstances of the present case, we cannot say that the trial court's finding on mitigation of damages was against the manifest weight of the evidence. See *MXL Industries, Inc.*, 252 Ill. App. 3d at 31 (finding that the trial court's determination that the landlord had made reasonable efforts to mitigate damages was supported by sufficient evidence where the evidence presented at the mitigation hearing showed that the landlord had offered to relet the property at or near the same monthly amount; had sought and obtained some partial short-term rentals of the property, albeit at a reduced rate; had engaged a building manager; had put a sign up on the property; had made calls to bankers, real estate brokers, and developers seeking to relet the property; had advertised the property in local and regional newspapers; had called his expert witness to testify at the mitigation hearing that the rental price and marketing approach were reasonable; and where the tenant's own expert admitted that placing advertisements and erecting a sign were reasonable steps toward reletting the property).

¶ 50        In ruling upon this issue, we need not determine whether the documents from Resquared were properly admitted into evidence. The other evidence presented on mitigation of damages, as described above, overwhelmingly established that plaintiff had made reasonable and diligent efforts to mitigate its damages. Thus, even if the Resquared documents were improperly admitted into evidence, that decision had no effect on the trial court's ultimate ruling on

22

mitigation of damages and would not result in a reversal of that ruling on appeal. See *Tzystuck v. Chicago Transit Authority*, 124 Ill. 2d 226, 243 (1988) (indicating that a new trial should be ordered because of the improper admission of evidence only if it appears that the improperly admitted evidence affected the outcome of the trial).

¶ 51                      C. The Trial Court's Assessment of
                   Damages and Attorney Fees Against Swinford

¶ 52        As the third and final issue on appeal, defendant Swinford argues that the trial court erred in its assessment of damages and attorney fees against her. Swinford asserts that the trial court's ruling on damages and attorney fees was incorrect for two reasons. First, Swinford contends, the trial court incorrectly assessed interest and attorney fees against Swinford past the expiration date of her guaranty in May 2024 (or May 2023 as Swinford contends in the first issue in this appeal), despite ordering that she was not liable for interest or attorney fees after that date. Second, Swinford maintains, the trial court incorrectly assessed the accelerated deferred rent balance of over $40,000 against Swinford, even though plaintiff never exercised its right to accelerate the deferred balance by notifying Swinford of that election and even though the guaranty was not subject to later amendments to the lease, such as the COVID-19 amendment that put the deferred rent provisions into place. For those reasons, Swinford asks that we vacate the trial court's ruling on damages and attorney fees and remand this case for the trial court to corrects its errors and to recalculate those amounts.

¶ 53        Plaintiff argues that the trial court's assessment of damages and attorney fees against Swinford was supported by the evidence and should be upheld. According to plaintiff, the trial court did not find that Swinford's liability for interest, late fees, and attorney fees ended on the date that the guaranty agreement expired but, instead, adopted the position from plaintiff's written closing argument, which assessed those amounts through the date of the trial court's

23

bench trial ruling. In addition, plaintiff contends, the trial court correctly assessed the accelerated deferred rent balance against Swinford because plaintiff was not required to notify defendants of the acceleration under the terms of the COVID-19 amendment or had done so by filing its complaint and serving summons and because any notice or demand upon defendants would have been futile since defendants had already stopped making all payments to plaintiff. For all of the reasons stated, plaintiff asks that we affirm the entire amount of the trial court's judgment and that we remand this case for the trial court to determine the amount of appellate attorney fees to assess against defendants for plaintiff's defense of this appeal.

¶ 54    A trial court's ruling made after a bench trial will not be reversed on appeal unless it is against the manifest weight of the evidence. See *Reliable Fire Equipment Co. v. Arredondo*, 2011 IL 111871, ¶ 12. As noted above, a ruling is against the manifest weight of the evidence only if it is clearly apparent from the record that the trial court should have reached the opposite conclusion or if the finding itself is unreasonable, arbitrary, or not based upon the evidence presented. See *Best*, 223 Ill. 2d at 350. More specifically on the issue of damages, courts have stated that a trial court's ruling on damages will not be reversed on appeal unless the trial court ignored the evidence or the measure of damages was erroneous as a matter of law. See, *e.g.*, *Strong v. City of Peoria*, 401 Ill. App. 3d 1096, 1098 (2010).

¶ 55    In the present case, after reviewing the record, we are unable to determine with any certainty what the trial court intended with its ruling on damages and attorney fees. The trial court made only a brief written ruling and did not announce or explain its ruling in an oral pronouncement. Although the trial court's written ruling indicates that plaintiff conceded that interest and attorney fees accruing after May 2024 (the date that the trial court found was the expiration date of Swinford's guaranty) could not be assessed against Swinford, plaintiff on

24

appeal denies that it made that concession and plaintiff's written closing argument in the trial court shows that such a concession was not made. In addition, despite the trial court indicating in its written ruling that interest and attorney fees accruing after May 2024 would not be assessed against Swinford, the trial court adopted the damages and attorney fees amounts set forth in plaintiff's closing argument, which assessed interest and attorney fees against Swinford that were accrued through the September 2025 date of the trial court's ruling. In any event, because we have already determined that the trial court erred in ruling on when Swinford's obligations under the guaranty agreement ended, we vacate the trial court's damages and attorney fees awards against Swinford and Mindful Life and remand this case for the trial court to recalculate those amounts to make its ruling clear as to whether interest and attorney fees that accrued after the May 2023 end date of the guaranty agreement are to be assessed against Swinford. We deny plaintiff's request for an award of attorney fees for its defense of this appeal because plaintiff has made no argument as to whether such an award would be appropriate if we ruled in defendant Swinford's favor on the main issue raised. See *People ex rel. Illinois Department of Labor v. E.R.H. Enterprises, Inc.*, 2013 IL 115106, ¶ 56 (indicating that the appellate court is entitled to have the issues before it clearly defined with relevant authority cited and cohesive arguments presented and is not simply a depository into which a party may dump the burden of argument and research).

¶ 56                                             III. CONCLUSION

¶ 57        For the foregoing reasons, we: (1) affirm the trial court's finding that plaintiff reasonably attempted to mitigate its damages (the second issue discussed above); (2) conclude that Swinford's guaranty ended in May 2023, seven years after the date that the lease and guaranty agreement were executed in May 2016 (the first issue discussed above); (3) reverse the trial

25

court's grant of plaintiff's motion for partial summary judgment on that issue and grant Swinford's cross-motion for the same relief (the first issue); and (4) vacate the trial court's damages and attorney fees awards against Swinford and Mindful Life and remand this case for the trial court to recalculate those awards (the first and third issues discussed above).

¶ 58   Affirmed in part, reversed in part, and vacated in part.

¶ 59   Cause remanded with directions.